## D'OLE v. KANSAS CITY STAR CO.

(Circuit Court, W. D. Missouri, W. D.   June 12, 1899.)

1. COPYRIGHT—SUIT FOR INFRINGEMENT—DAMAGES.

In an action for damages for infringement of a copyright by the publication in a newspaper article of matter taken from a pamphlet copyrighted by plaintiff, the chief purpose of which was to advertise his business as a photographer, and of which a large number of copies had been distributed free, but none had ever been sold or offered for sale, and where the evidence leaves it doubtful whether the pamphlet has any commercial value, the court cannot determine plaintiff's loss on account of the publication with sufficient certainty to warrant a judgment for substantial damages.

2. SAME—PRIOR PUBLICATION.

Giving away copies of a pamphlet by the author, or leaving copies in a public hotel office, constitutes a publication which renders a subsequent copyright ineffectual.

Action at Law for Damages for Infringement of a Copyright.

Teasdale, Ingraham & Cowherd and C. M. Ingraham, for plaintiff.

Wash Adams, for defendant.

PHILIPS, District Judge. This is an action for damages for the invasion of a copyright, and grows out of substantially the following state of facts: The plaintiff is a photographer at Kansas City, and in 1896 he got up a pamphlet under the title of "The Answer," followed by the words, "How to Sit—When to Sit— What to Wear—When Having a Photo Taken." This pamphlet is about 4 by 6 inches in size, and contains about 10 or 12 pages of printed matter, including pictures of various persons. As the preface shows, its principal purpose seemed to be to advertise and exploit the plaintiff's profession, and his attainment in the art of photography. The rest of the matter contains simply directions about how to dress and pose, and the like, in having a photograph taken, with additional precautionary suggestions along this line. On the 15th day of March, 1897, the plaintiff obtained a certificate from the librarian of congress of the pamphlet being copyrighted. In November, 1897, the defendant published in its newspaper, the Kansas City Star, an article taken from the Philadelphia Ledger, a newspaper published in Philadelphia, Pa., which contained several of the paragraphs found in said pamphlet. It is sufficient to say that this article contained enough of the printed matter of the pamphlet to constitute an infringement of plaintiff's work. At the time of this publication by defendant, it was not aware of the existence of plaintiff's pamphlet, and of course was not aware that it had been copyrighted. For this publication plaintiff has brought suit for $5,000 damages. The cause has been submitted to the court without the intervention of a jury.

On the evidence in this case, if the court were to meet the question of the ascertainment of damages, it would be exceedingly difficult to find any substantial predicate for the assessment. The evidence shows that the plaintiff in the spring of 1897, and perhaps earlier, in part, had freely distributed and scattered about

10,000 or more copies of this pamphlet over the city, on the streets, and in business houses and private residences, showing that he regarded it in the nature of an advertising "dodger." He never sold a single copy of the pamphlet, nor even offered it for sale. He had never, prior to this publication in the Star, had any estimation made by any publishing house or merchant, or other person, as to any terms upon which they would undertake its sale. And the only evidence offered at this trial in respect of its commercial value is his statement and that of one other witness to the effect that they thought it could be sold by some business house to persons who might desire to have their photographs taken, or to other photographers, while other witnesses in the case— experienced photographers—testified that they had seen other pamphlets of a not very dissimilar character, and that the information contained therein was quite common to the profession, and that they did not regard the pamphlet as possessing any commercial value. From which it is quite apparent that any estimation the court could place upon its value would be highly speculative. Furthermore, how could the court, with any degree of required certainty, justifying the assessment of damages against the defendant, determine what damage resulted to the plaintiff from such publication in this newspaper? The plaintiff did not distribute, or attempt to distribute, or sell, a single copy of this pamphlet after the publication in the newspaper, to enable the court by comparison to determine in the remotest degree how the commercial value of his pamphlet was affected by such publication. He could not, without such test or effort, content himself by simply saying that he assumed that his exclusive property in the pamphlet was injured by the newspaper publication, and that it would be useless for him to make the effort to dispose of his pamphlet. Such a method of constituting a basis for the assessment of damages would be too easy for the plaintiff, and would certainly be a very unsafe criterion for the court to recognize in assessing such damages.

In the view, however, taken by the court of another branch of this case, it is not necessary that the court should further discuss the question of damages. It is conceded that if the fact should be found, on the weight of evidence, that prior to securing the copyright the plaintiff published his pamphlet, he is not entitled to the protection of the statute giving him the exclusive right to publish its contents, and this action would fail. The certificate of the librarian of congress shows, as already stated, that the copyright was granted on the 15th day of March, 1897. Beyond cavil, the evidence shows that an edition of this book was printed in Kansas City, paid for by and delivered to the plaintiff, about the middle of December, 1896. This edition amounted to 5,000 copies. Although not authorized by law to do so, this edition, on the reverse side of the title page, contained the following, "Copyrighted 1896 by W. T. D'Ole, Kansas City, Mo." The evidence further shows that the plaintiff then stated that he wished to get out these pamphlets for distribution for the holidays,—evidently re-

ferring to the approaching Christmas, 1896,—and that he then knew the print showed that the book purported to have been copyrighted in 1896; and he stated that this made no difference, as nobody would know or pay any attention to it. The inference is therefore persuasive that he obtained these pamphlets for circulation before or during said holidays; and it is an afterthought when he states that he would not distribute the books prior to obtaining the copyright, as he stated that the absence of such certificate of copyright made no difference with him. This evidence is supplemented by the further testimony of a credible witness, sustained by the circumstance of a contemporaneous event well calculated to fix the date in his mind, that he saw copies of this book at a hotel in this city on or before the 20th day of February, 1897. This is followed up by the testimony of one of the ladies whose picture appears in this pamphlet, that her father on or about the 1st day of March, 1897, brought her one or more copies of this pamphlet. In its ordinary acceptation, the word "publication" means "the act of publishing a thing or making it public; offering to public notice; or rendering it accessible to public scrutiny." In copyright law, it is "the act of making public a book; that is, offering or communicating it to the public by sale or distribution of copies." Without undertaking to state the qualifications of this definition, as applied to certain incidents, by which the book might be exhibited by the author, prior to copyrighting it, without amounting to a publication, within the spirit of the statute, it is safe to say that the appearance of a pamphlet, after its delivery to plaintiff by the publisher, in a public hotel, subject to be seen and read by any person about so public a place, certainly was a "rendering it accessible to public scrutiny," and was likewise a "communicating it to the public by distribution of copies." When copies of it were furnished to the father of said witness, and put in her hands for her scrutiny, or any person to whom she might show it, it was a sending out of the book. More than this, the evidence of the plaintiff shows that in March, 1897, just after he obtained his certificate from Washington, he ordered and had published 5,000 more copies of this pamphlet, a copy of which last edition is in evidence. The first sentence in the preface to this edition is as follows: "Since we issued the last edition of this pamphlet, we have enlarged our premises, added more light, more accessories, and fitted up a studio second to none," etc. This is the direct statement of the plaintiff himself, put into the edition of March, 1897, that he had issued a previous edition. In its ordinary acceptation, "to issue" is to "send out; to put into circulation." And, as applied to the matter of the publication of an edition of the book, its natural meaning would be "to put into circulation." The construction of the pamphlet itself, which the plaintiff, with evident pride, exhibited on the witness stand, shows that he is a man of education; and it must be presumed that when he wrote himself a preface for this last edition, stating, "Since we issued the last edition," he understood its meaning and purport, as any other author would be presumed to have employed the

term. He undertook on the witness stand to explain away the obvious import of the term he had employed by stating that the year before he had gotten up a pamphlet somewhat similar in character, but very defective, called "Pointers," which he never distributed, and that he had reference to that print when he spoke of the former edition, and that he employed the word "issued" not in the sense of having published. But what is fatal to this contention is, first, the fact that the statement is, "Since we issued the last edition of this pamphlet." The evidence incontestably shows that the last edition was simply copied from, and was a reproduction of, this pamphlet printed in December, 1896. And, second, the statement of plaintiff on the witness stand that the first paper, called "Pointers," was never published or circulated by him, and was thrown into the furnace and burned. It is therefore absolutely incredible that when he used the language, "Since we issued the last edition of this pamphlet," he had in mind "Pointers," which had never been issued, and which had never been distributed, and the existence of which was unknown to the public; and there could therefore have been no occasion for, or sense in, referring to it in the preface of the pamphlet in question.

Again, according to plaintiff's present contention, if he had not circulated any of the 5,000 copies printed and delivered to him in December, 1896, why should he in March, 1897, have 5,000 copies more printed, when he then had on hand 5,000 copies? The 5,000 copies already on hand were certainly sufficient for scattering over the town as an experiment, to see whether or not they brought him any return of business or patronage. Such a course of conduct is so unusual and extraordinary in a business man as to challenge one's credulity respecting the statement that he made no distribution of these pamphlets prior to March 15, 1897. In his deposition given in this case, the plaintiff stated that he did not get out the copy of December, 1896, in time to distribute it in 1896, when the evidence, beyond contradiction, establishes the fact that the pamphlets were delivered to him as early as the 18th day of December, 1896; and this question was propounded to him: "When you got out this edition in the fall of 1896, did you give out any of the pamphlets or books in '96? Ans. I presume we did." And this presumption of his was a most natural one, because it is inconceivable that he would have printing done, and pay therefor, and take the pamphlets away on the 18th day of December, without distributing any of them, when, as the preface shows, its object was to advertise his business and to draw customers; and this is emphasized by the testimony of the witness that he said he wanted them for use in his holiday business. Without trenching too far upon the domain of metaphysics, and without even the appearance of offense, the court may be pardoned for adverting to another fact in this connection. The most striking, and possibly, in the estimation of the plaintiff, the most catching, thing about this pamphlet, is the false presentment of the face and artistic pose of the plaintiff on the front side thereof. The faces of the "modest beauties" and "little ones" presented in the pamphlet are

hidden away somewhat in the inner leaves of the book; and it will be readily recalled, from plaintiff's testimony and manner on the witness stand, how greatly inflamed was he with admiration of this offspring of his original conception and severe mental parturition. Is it then to be presumed that he could patiently have such a child of his genius, with his own face stamped upon it, concealed for three months in his art gallery? A little matter like the absence of the copyright certificate could hardly have stood so long between his caution and his consuming pride of a wider fame, and ambition for more customers. It became painfully apparent on the hearing of this case that the plaintiff and his witnesses, since the taking of his deposition herein, and from the contest at the trial, recognized the necessity of placing the distribution of the pamphlets after the 15th day of March, 1897; but, without impugning the integrity of the witnesses, the other facts and circumstances in evidence are of such persuasive force that the court feels constrained to say that the weight of evidence tends to show that at least some of the pamphlets printed in 1896 were prior to March 15, 1897, distributed in such manner as to constitute a publication, within the letter and spirit of the law. It is therefore unnecessary for the court to discuss other questions of law raised by counsel in this case,—among which is that raised on the fact that after the plaintiff obtained his copyright he never corrected the statement on the page following the title page, that it was copyrighted in 1896. On this question of law the court expresses no opinion. Verdict and judgment for the defendant.